Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 85 | **DATE** | 12/20/2001 |
| **CASE TITLE** | USA vs. Robin Rothberg | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set forth on the attached order, the joint defense motion requesting determination of plea agreement ambiguities is denied. However, the Court has found pursuant to Federal Rule of Criminal Procedure 32(e) that fair and just reasons exist permitting the defendants to withdraw their guilty pleas if they wish to do so. The current sentencing dates for all defendants are vacated. The case is set for a status hearing on 1/18/02 at 1:00 p.m. for the purpose stated above. All counsel are directed to appear.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 2 1 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 283 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| OR | courtroom deputy's initials | DEC 20 PM 2:48 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | Case No. 00 CR 85 |
| ) | |
| ROBIN ROTHBERG, et al. ) | |

DOCKETED
DEC 21 2001

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

The defendants in this case were charged pursuant to 18 U.S.C. §371 with conspiracy to commit copyright infringement in violation of 17 U.S.C. §506(a)(2) and 18 U.S.C. §2319(c)(1). Thirteen of the defendants have pled guilty, and one was found guilty after a jury trial. Sentencing dates have been set for mid-February 2002. The Court recently held an evidentiary hearing on a hotly contested sentencing issue, namely the value of the infringing items, a key factor in determining the offense level under the Sentencing Guidelines. Certain defendants have jointly moved to preclude the government from arguing for any valuation in excess of $1.1 million, claiming that this violates their plea agreements. For the reasons stated below, the Court denies defendants' motion. However, after careful consideration, the Court has determined to give the defendants who pled guilty the opportunity to withdraw their guilty pleas and proceed to trial.

**Background**

The indictment alleges that the defendants were members of a computer software piracy group called "Pirates with Attitudes," an organization "dedicated to the illegal reproduction and distribution of copyrighted software over the Internet, for the use and benefit of members of

PWA, and of those persons to whom PWA members further distributed that software." Indictment ¶2. The group was alleged to have members worldwide and an elaborate hierarchy. According to the indictment, PWA stored libraries of pirated software on several File Transfer Protocol sites, including one called Sentinel, which came on line in 1995 and was in operation until January 2000. Access to the Sentinel site was controlled by the senior members of PWA, and members with access were able to download pirated computer programs to their own computers and distribute them to others.

The computer hardware used to operate the Sentinel site was located at the University of Sherbrooke in Sherbrooke, Canada. In January 2000, this equipment was seized by the FBI, with the cooperation and assistance of Canadian law enforcement personnel. The only software programs that remained on Sentinel as of the date of the seizure were those that had been uploaded in late 1999 and early 2000; programs uploaded earlier evidently had been deleted as obsolete or for other reasons. Analysis by an FBI computer specialist produced a list of approximately 5,000 software programs that were still on the Sentinel site at the time of the seizure. Based on this, the government estimated the retail value of the programs at approximately $1.1 million and so advised defense counsel during the course of pretrial discovery. It also produced to the defense reports which described the analysis and its calculation of value. This was the state of affairs at the time all but one of the defendants pled guilty.

In preparation for the trial of defendant Christian Morley, the government asked a different FBI computer specialist, Christopher Hamblett, to conduct further analysis of the Sentinel computer. Hamblett developed a program that permitted him to extract data identifying

program uploads as far back as January 1998. He determined that from that date through January 2000, over 54,000 software programs had been uploaded to the Sentinel site. Hamblett also developed a calculation which the government maintains enabled him to estimate the number of complete and uncorrupted programs (not including "beta" (test) versions of programs) that had been uploaded, yielding a net total of 34,582. Based on this figure, and extrapolation from evidence concerning the retail value of certain of the programs, the government now maintains that the total value of the programs uploaded to the Sentinel site was in excess of $10 million.

The defendants argue that the proper valuation is zero, and they have challenged the accuracy and reliability of the government's $10 million figure on various grounds. These disputes present difficult issues requiring careful consideration, and the Court is not yet prepared to decide them. As a threshold matter, however, the defendants who pled guilty have challenged the government's right to assert the new, higher loss figure, claiming that when they pled guilty, they had an understanding that the loss figure would not exceed the $1.1 million figure the government was then advocating.

**Discussion**

Twelve of the defendants pled guilty pursuant to plea agreements. Each plea agreement contained a series of agreements between the government and the defendant on certain Sentencing Guidelines issues. In particular, each plea agreement contained the following language:

> 6. For purposes of applying the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree on the following points:
>
> ...

3

> (b) It is the government's position that the ascertainable value of the infringing items on the Sentinel site is in excess of $1 million, and according that, pursuant to Guideline §§ 2B5.3(b)(1) & 2F1.1(b)(1)(L), the base offense level is increased at least 11 levels. The defendant reserves the right to object to the government's valuation of the infringing items at sentencing.

Plea Agreement ¶6(b). The reference in the quoted paragraph to "in excess of $1 million" was footnoted as follows:

> The approximate value of the programs available on Sentinel was arrived at as follows: Retail prices for the software programs were obtained from industry groups or directly from software manufacturers. Whenever multiple values for the same software were given, the lowest possible price was used in the calculation. Also, in each case where the price of a particular software program depended on the number of licenses purchased for, the sites used by, or the users registered to a product, the value of the minimum number of licenses, sites, or users – or the lowest possible value – was used. In this manner, approximately 45% of the software available on the Sentinel site was priced and determined to have a value in excess of $1 million. The remaining 55% of the programs on Sentinel are largely specialized or custom utilities for which no retrial price is readily available, or beta versions of software, which have value, but no suggested retail price. Moreover, each software program has been counted in the calculation only once, for the upload. The current loss figure is not multiplied by the number of times that each program was distributed, or downloaded, from the Sentinel site.

Plea Agreement, ¶6(b), fn.1.

It is undisputed that at the time of most (but not all) of the defendants' guilty pleas, the government's belief was that the provable value of the infringing items was approximately $1.1 million – and more specifically, that the probable value was limited to the software that was still on the Sentinel site at the time the FBI shut it down. It is likewise undisputed that the basis for deriving the current $10 million figure did not emerge until just before Morley's trial. Defendants contend that the government should not be able to argue for the higher figure.

A plea agreement is a contract. *E.g., United States v. Williams,* 198 F.3d 988, 991 (7th Cir. 1999). When a defendant's guilty plea "rests in any significant degree on a promise or

4

agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 260 (1971). The government's promise need not be an express promise to be enforceable; "an implied promise will do." *United States v. O'Brien*, 853 F.2d 522, 526 (7th Cir. 1988), *quoted in Williams*, 198 F.3d at 992.

The simple fact, however, is that the government made no promise, either express or implied, not to advocate a higher valuation figure greater than $1.1 million. The plea agreement says that the government's claim is that the value of the infringing items was "*in excess of* $1 million." "In excess" does not mean "slightly in excess." And if there were any ambiguity in that phrase, it would be resolved by the statement which immediately follows it: that the government's position is that the base offense level is to be increased "*at least* 11 levels." "At least 11 levels" cannot reasonably be construed as meaning "11 levels" or as a promise not to seek a greater increase.

Moreover, the plea agreements each contained an acknowledgment by the defendant and defense counsel that "the above calculations are preliminary in nature and are based on facts known to the government as of the time of this Plea Agreement." Plea Agreement ¶6(f). There is no claim by any defendant other than Slater that this representation was false, that is, that the government's understanding at the time of the defendant's plea agreement was that the value was something other than the estimated $1.1 million figure. And even if it were false, that would provide a basis only to void the plea agreement, not to rewrite it in the manner the defendants propose.

The defendants claim that none of them would have pled guilty if they had understood

5

that there was a possibility of a ten-fold increase in the government's valuation figure. While that may be so, it provides no basis for precluding the government from arguing for a higher figure. "More than an 'unfounded and unilateral belief'" on the part of the defendant is required to support a claim that the government made a promise in exchange for the defendant's plea. *See Williams,* 198 F.3d at 992 (quoting *O'Brien,* 853 F.2d at 526). "[A] defendant's rights under a plea agreement are limited by what the parties in fact agreed to." *United States v. Lezine,* 166 F.3d 895, 901 (7th Cir. 1999). Here there was no agreement by the government not to advocate a higher figure, and accordingly there is no promise, either express or implied, for the Court to enforce.

That, however, is not the end of the story. It is undisputed that at the time of the defendants' pleas (with the apparent exception of Slater), both parties understood that the facts would support a valuation of only $1.1 million under the government's theory. Though all parties were on notice that this valuation was based on the software that was still on the Sentinel site at the time of the seizure, and that there had been additional software uploaded to the site at earlier points in time, the parties' mutual belief was that the information necessary to identify or evaluate those uploads was unavailable. The government had analyzed the data on the Sentinel computer and believed, or at least assumed, that it had extracted all it could extract. Defendants were aware of the government's calculations and analysis; they likewise believed, or at least assumed, that the government had extracted all it could extract; and they had no reason to believe that additional information would be available. (There is no indication that the defense was given a "mirror image" of the Sentinel hard drives so that it could conduct its own analysis.) Though the language of the plea agreements leaves open the possibility of an argument for a

6

valuation figure that includes the earlier-uploaded software, neither side had any basis to believe that this was feasible.

Though the parties' underlying assumption about the valuation does not constitute an express or implied promise by the government not to argue for more, the Court finds that the parties were operating under a mutual mistake of fact at the time of the guilty plea (again with the exception of Slater, whose case we will discuss momentarily). In *Williams,* the Seventh Circuit made a clear delineation between promises made to induce a plea and mutual mistakes of fact that underlie the decision to enter into a plea agreement. The defendant in that case argued that because he and the government had operated under a mutual mistake of fact at the time of his guilty plea, his plea agreement should be modified – "reformed," in the lingo of contract law – to make it consistent with that misunderstanding. That is essentially what the defendants seek in the present case. The Seventh Circuit, however, rejected the argument in *Williams*. It held that "[r]eformation is the appropriate remedy when the mistake 'is one as to expression – one that relates to the contents or effect of writing that is intended to express an agreement.'" *Williams,* 198 F.3d at 994 (quoting Restatement (Second) of Contracts §155, comment a). In other words, if the parties have incorrectly recorded their agreement, reformation is an appropriate remedy. *See, e.g., Edward E. Gillen Co. v. City of Lake Forest,* 3 F.2d 192, 197 (7th Cir. 1993). But that is not what occurred here; as we have held, the parties did not agree either on a $1.1 million valuation figure, nor did they agree that the government would not advocate a higher valuation figure. Rather, this is a case in which the parties made a mistake as to a basic assumption underlying the contract, one that has a material effect on the contract's operation. In such a case, "[i]t is clear from the basic principles of contract law that the remedy ... is to void the contract,

7

not to offer [defendant] the opportunity to reform it unilaterally." *Williams,* 198 F.3d at 994. In short, a "fair and just" reason exists to permit the defendants to withdraw their guilty pleas and go to trial. *See* Fed. R. Crim. P. 32(e) (court may permit defendant to withdraw guilty plea before sentencing for "any fair and just reason").

It is important to re-emphasize the reasons for this determination. It is not particularly uncommon for a Sentencing Guideline calculation to end up being different from what the parties hoped or expected at the time of a defendant's guilty plea. This is particularly common with respect to criminal history calculations; in the Court's experience, it is not at all unusual for the Probation Office's criminal history evaluation to result in a higher criminal history level than the parties had agreed upon in the plea agreement. But in that case and the vast majority of other cases in which the Guideline calculation turns out different from what is expected, the parties have some level of awareness, or at least have a basis to be aware, that different information could turn up. In this case, by contrast, the parties did not believe that it was possible to extract the information regarding the earlier software uploads. That unusual state of affairs differentiates this case from others in which the parties have made, at the time of the guilty plea, a mutual mistake regarding the Guideline calculation.

The factual background regarding Slater is slightly different but leads to the same conclusion. At the time of Slater's plea there likely was no longer a *mutual* misunderstanding regarding the government's ability to claim a higher valuation; computer specialist Hamblett likely had performed enough of his analysis by that time to give the government reason to believe that its valuation figure would be considerably higher. But Slater was not aware of this; he was still operating under the parties' previous assumptions. For this reason, Slater also has a "fair

8

and just reason" permitting him to withdraw his guilty plea.

It is conceivable that some or all of the defendants will determine not to withdraw their guilty pleas. But they are entitled to the opportunity to make that election. Defense counsel are directed to advise their clients of the Court's ruling in this regard. Because the Court's ruling has a direct impact on the timing of preparation of the presentence reports, we have decided to vacate the currently-set sentencing dates for all of the defendants. The case is set for a status hearing on January 18, 2002 at 1:00 p.m. The government and all defense counsel are directed to be present. Each defendant who wishes to withdraw his guilty plea should so advise the Court, in writing, on or before that date, and the Court will at that time set a trial date. Any defendant who does not advise the Court by that date and time of a desire to withdraw his guilty plea will be deemed to have elected not to do so, and the Court will set a new sentencing date. We will also set a new sentencing date at that time for defendant Morley.

## Conclusion

For the reasons stated above, the joint defense motion requesting determination of plea agreement ambiguities is denied. However, the Court has found pursuant to Federal Rule of Criminal Procedure 32(e) that fair and just reasons exist permitting the defendants to withdraw their guilty pleas if they wish to do so. The current sentencing dates for all defendants are vacated. The case is set for a status hearing on January 18, 2002 at 1:00 p.m., for the purposes stated above. All counsel are directed to appear.

Date: December 20, 2001

MATTHEW F. KENNELLY
United States District Judge